[This decision has been published in *Ohio Official Reports* at 94 Ohio St.3d 160.]

THE STATE EX REL. ROUWEYHA, APPELLANT, *v.* INDUSTRIAL COMMISSION OF OHIO ET AL., APPELLEES.

[Cite as *State ex rel. Rouweyha v. Indus. Comm.,* 2002-Ohio-347.]

*Workers' compensation—Surgeon's voluntary limitation of income—Industrial Commission did not abuse its discretion in denying application for wage-loss compensation, when.*

(No. 00-2137—Submitted October 30, 2001—Decided January 30, 2002.)

APPEAL from the Court of Appeals for Franklin County, No. 00AP-50.

_____

*Per Curiam*.

{¶ 1} Appellant-claimant, Marwan R. Rouweyha, is an orthopedic surgeon. In the 1970s, claimant injured his right arm in an incident unrelated to work. Over the years, claimant's continued use of that extremity in his surgical practice apparently caused carpal tunnel syndrome. In 1992, appellee Industrial Commission of Ohio allowed a workers' compensation claim for that condition. Claimant received temporary total disability compensation from that point until May 5, 1998, when it was terminated due to maximum medical improvement.

{¶ 2} Following his 1992 surgery, claimant tried to keep his practice going by doing nonsurgical consultations. Unable to meet his expenses, claimant closed the practice in 1995.

{¶ 3} Claimant's activities over the next three years are not known. Sometime in 1998, claimant was approached by the owners of a medical practice that specialized in hair transplant surgery, Physicians Hair Transplant Group ("PHTG"). PHTG was interested in buying claimant's medical building. Claimant, in turn, apparently inquired about the qualifications needed to become a hair

transplant surgeon. Ultimately, the two parties entered an agreement. The first portion—signed by claimant and two PHTG officers—read:

"Physicians Hair Transplant Group will train Doctor Marwan R. Rouweyha to become a hair transplant surgeon. Once Doctor Rouweyha completes his training and if he elects to make hair transplantation his new profession, he will perform hair transplant procedures for Physicians Hair Transplant Group for a period of one to three years free of any monetary compensation."

{¶ 4} Below their signatures—undated and in different type—is this paragraph:

"The present fee to train an individual to become a specialist in the field of hair transplant surgery is $60,000 (U.S.)[.] In order not to pay these training fees to P.H.T.G.[,] Dr. M.R. Rouweyha will be working for a period of two (2) years without compensation in exchange for the training fee of $60,000."

{¶ 5} Claimant did not sign that portion of the agreement.

{¶ 6} On October 7, 1998, claimant moved the commission for wage-loss compensation as of November 1, 1998, the day he started working allegedly without pay for PHTG. Claimant argued that the waiver of PHTG's training fee should be counted as income over the two years that he was supposedly working without pay. Claimant, therefore, sought the difference between his perceived $30,000 post-injury yearly income and the approximately $120,000 he was making before his carpal tunnel syndrome forced him from surgical practice. Claimant accompanied his motion with the medical report of Dr. Earl Z. Browne, Jr., who, five years earlier, opined that claimant was not yet ready to resume surgery.

{¶ 7} A district hearing officer allowed the application. A staff hearing officer reversed, after finding that "claimant failed to make a good faith effort to find employment within his physical restrictions and thus has failed to establish his entitlement to wage loss compensation.

**{¶ 8}** "The claimant has been a practicing physician for many years. During those years this Staff Hearing Officer has read many reports that he has written regarding Permanent Total Disability, Permanent Partial Disability, extent of disability, etc. Surely with his wealth of experience he could have earned more than a mere $30,000.00 per year serving as a company doctor or just doing specialist examinations. It would appear that this claimant has voluntarily limited himself to work he enjoys doing. In any event[,] he certainly has not established that he sought comparably paying work or any form of employment at all other than becoming a hair transplant specialist for which he is barely paid.

**{¶ 9}** "Based on the foregoing facts[,] the Staff Hearing Officer finds that the claimant has failed to establish that the wage loss he suffers is causally related to his claim."

**{¶ 10}** Claimant filed a complaint in mandamus in the Court of Appeals for Franklin County, alleging that the commission abused its discretion in denying wage-loss compensation. The appellate court disagreed. Speaking through its magistrate, the court voiced numerous concerns:

"Relator had the burden of proving his wage loss claim. Conspicuously absent from the record is any information as to the number of hours per week that relator actually worked for PHTG as a hair transplant surgeon. The June 5, 1995 agreement and amendment [do] not obligate relator to perform full-time work during the two year period. For that matter, the agreement does not obligate relator to work any minimum number of hours per week or to perform any minimum number of surgeries on behalf of PHTG.

"In his October 7, 1998 affidavit of record, relator simply avers that he started working without pay at PHTG as of November 1, 1998, and that his agreement will be in effect for two years. There is no indication in the affidavit that the work will be full time or some specific lesser amount.

"Neither the commission nor this court is required to assume something that relator himself seems unwilling to state on the record. That is, this court cannot assume that relator worked full time for PHTG beginning November 1, 1998.

"If relator in fact worked part-time or even sporadically part-time for PHTG beginning November 1, 1998, the commission's finding that relator failed to make a good faith effort to find employment is right on point. Ordinarily, a claimant who elects to work part-time without engaging in a good faith job search cannot show a wage loss. * * *

"Also conspicuously absent from the record is any information as to the results of discussions between PHTG and relator regarding the purchase of his building. Obviously, if relator sold or leased his building to PHTG, such agreement or transaction may have influenced the agreement regarding the waiver of the training fee. That is to say, the record suggests that the relationship between PHTG and relator may involve more than the traditional employer/employee relationship. It is conceivable that the terms of the agreement of record may only be a part of a larger undisclosed transaction or agreement."

{¶ 11} Consequently, the court of appeals found that the commission did not abuse its discretion in finding a voluntary limitation of income.

{¶ 12} This cause is now before this court upon an appeal as of right.

{¶ 13} To secure wage loss, a claimant must causally relate his/her decreased earnings to the industrial injury. *State ex rel. Watts v. Schottenstein Stores Corp.* (1993), 68 Ohio St.3d 118, 121, 623 N.E.2d 1202, 1204. A claimant's voluntary acts that restrict earnings can sever the requisite causal relationship and foreclose wage loss. *State ex rel. Pepsi-Cola Bottling Co. v. Morse* (1995), 72 Ohio St.3d 210, 648 N.E.2d 827. Therefore, "certain post-injury employment is more carefully scrutinized. Among these are part-time and self-employment. Described generically as voluntary limitations of income, these two categories are examined to ensure that wage-loss compensation is not subsidizing business ventures or life-

style choices." *State ex rel. Brinkman v. Indus. Comm.* (1999), 87 Ohio St.3d 171, 173, 718 N.E.2d 897, 899.

{¶ 14} In seeking to establish causal relationship, "[a] claimant cannot successfully assert that an injury placed him/her at a competitive disadvantage in the job market without fully immersing himself/herself into the job market." *State ex rel. Carnahan v. Indus. Comm.* (1999), 86 Ohio St.3d 67, 69, 711 N.E.2d 680, 682, citing *State ex rel. Ooten v. Siegel Interior Specialists Co.* (1998), 84 Ohio St.3d 255, 703 N.E.2d 306.

{¶ 15} As explained in *Ooten*, "Causal relationship [between wage loss and injury] is often satisfied by evidence of an unsuccessful search for employment at the pre-injury rate of compensation.  While not universally required, mandating a work search under these facts is consistent with our directive to carefully scrutinize alternative employment that is not 'regular' full-time work. * * *  This is to ensure that claimant's job choice was motivated by the injury-induced unavailability of other work and was not a lifestyle choice. * * *

{¶ 16} "* * *

{¶ 17} "In this case, the commission reasoned that claimant never put himself into the labor market long enough to establish that his industrial injury prevented him from securing other employment at the pre-injury rate.  The commission, therefore, concluded that considerations other than claimant's industrial injury were the driving factors in claimant's decision to go into business for himself." *Ooten* at 256-257, 703 N.E.2d at 307-308.

{¶ 18} The commission made a similar finding here, and we uphold that decision.  Claimant has not alleged that he pursued any other opportunity than to try to keep his practice open by consulting.  Claimant, however, contends that under *Brinkman,* his acceptance of a PHTG position excused him from the requirements of a good-faith job search.  Claimant misreads *Brinkman*.

**{¶ 19}** In that case, claimant was barred by injury from returning to his former job as a policeman. Claimant found a part-time bus driver job, and continued to unsuccessfully look for other work. Claimant finally found a part-time job at Anheuser-Busch for $20 an hour. He accepted the job with the understanding that part-timers were given preference for full-time positions as they became available.

**{¶ 20}** The commission denied his wage-loss application after finding that claimant's acceptance of part-time work did not excuse a continuing search for full-time employment. We disagreed for two reasons. First, we disagreed with the assumption that the limitation of hours imposed by part-time work automatically translated into a proscribed limitation of income:

"With a $20 per hour job as we have here, however, this assumption is inappropriate. Twenty hours part-time at Busch will most likely exceed forty hours of minimum-wage work elsewhere." *Brinkman* at 173, 718 N.E.2d at 899.

**{¶ 21}** We also disagreed with the commission's imposition of a duty to continue to look for full-time work once the claimant accepted the job at Busch. Citing the Florida case of *Stahl v. Southeastern X-Ray* (Fla.App.1984), 447 So.2d 399, we wrote:

"In this case, the commission is also asking the claimant to 'leave a good thing.' *Stahl* is admittedly distinguishable in that post-injury employment was full-time, not part-time, but whether that does or should excuse a broader-based analysis is questionable. Wage-loss compensation is not forever. It ends after two hundred weeks. R.C. 4123.56(B). Thus, when a claimant seeks new post-injury employment, contemplation must extend beyond the short term. The job that a claimant takes may have to support that claimant for the rest of his or her life—long after wage-loss compensation has expired.

"This does not mean that the claimant is entitled to turn down a job as paying too little and still claim wage-loss compensation. Neither, however, should

it compel the departure from a lucrative job with full-time potential for menial work simply because the latter is immediately available full-time.

"There is no evidence contrary to our claimant's assertion that he took the Busch job because it was the first job—full or part-time—that was offered. Claimant's uncontradicted statements also indicate that part-timers were given preference when full-time slots opened. This supports claimant's assertion that a move to full-time was a realistic possibility.

"We find, therefore, that under these facts, the commission abused its discretion in finding a voluntary limitation of income. Viewed in totality, the facts do not establish such a limitation or a life-style-motivated job selection—the two concerns that have prompted close examination of part-time work." *Brinkman* at 174, 718 N.E.2d at 900.

{¶ 22} What distinguishes our case from *Brinkman* is the conspicuous lack of information as to the former. In *Brinkman*, we knew that claimant (1) had looked for other full-time work, albeit unsuccessfully; (2) took the most lucrative job available; and (3) had a real potential for full-time work. Equally important, we knew the number of hours claimant worked.

{¶ 23} In this case, key specifics, as noted by the court of appeals through its magistrate, are missing. Such specifics include the number of hours of employment as well as the nature of the relationship between claimant and PHTG. As the magistrate noted, claimant's agreement with PHTG does not specify how many hours claimant was to work or how many surgeries claimant was to perform.

{¶ 24} The magistrate makes a very valid point. Perhaps claimant indeed worked forty hours per week. Perhaps claimant worked only one day per week. If the latter, the inference of lifestyle motivation is almost overwhelming. And, as the magistrate stressed, it is claimant's burden to establish that he took the PHTG position for purely injury-related reasons. Claimant's failure to provide any further

information—particularly considering the nature of claimant's profession—is fatal to his successful assertion of an injury-induced wage loss.

{¶ 25} The magistrate was also concerned about the sale of claimant's building to PHTG. The sale of the building may mean that claimant's relationship to PHTG is other than the traditional employer/employee relationship.

{¶ 26} Claimant has supplied no tax records, no wage or hour information, no evidence of any other job contacts. He has supplied only a questionable, partially signed agreement purportedly between himself and PHTG. Claimant is a licensed medical doctor and it was within the commission's discretion to conclude that claimant's professional qualifications could generate a yearly income in excess of $30,000. Claimant is asking the commission to make up a huge wage differential without any evidence of a good-faith job search. Accordingly, the commission's order is upheld.

{¶ 27} The judgment of the court of appeals is affirmed.

*Judgment affirmed.*

MOYER, C.J., DOUGLAS, RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

_____

*Elliott, Heller, Maas, Moro & Magill Co., L.P.A.*, and *C. Douglas Ames*, for appellant.

*Betty D. Montgomery*, Attorney General, and *Gerald H. Waterman*, Assistant Attorney General, for appellees.

_____